UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| MIKE G., AND S.G.,<br><br>Plaintiffs,<br><br>v.<br><br>PREMERA BLUE CROSS,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART [ECF NO. 28] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING [ECF NO. 27] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:24-cv-00236-DBB-CMR<br><br>District Judge David Barlow |

Before the court are the parties' cross-motions for summary judgment.[1] Plaintiffs Mike G. and S.G. (collectively "Plaintiffs") sued Defendant Premera Blue Cross ("Premera") under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health and Parity and Addiction Act ("MHPAEA" or "Parity Act").[2] Plaintiffs argue that S.G. is entitled to coverage of her mental health care at a residential treatment center under her health insurance plan. For the reasons below, this court grants in part Plaintiffs' Motion for Summary Judgment and denies Defendant's Motion for Summary Judgment.

[1] Def.'s Mot. Summ. J. ("Def.'s MSJ"), ECF No. 27, filed Feb. 11, 2026; Pls.' Mot. For Summ. J. ("Pls.' MSJ"), ECF No. 28, filed Feb. 11, 2026.
[2] Compl., ECF No. 1, filed Mar. 30, 2024.

## BACKGROUND

### *Plan Coverage and Relevant Guidelines*

Plaintiff Mike G. participated in an employee welfare benefit health plan ("the Plan") governed by ERISA.[3] Mike G.'s daughter, S.G., was a beneficiary of the Plan.[4] Premera served as the insurer and claims administrator for the Plan.[5]

The Plan covers "mental health services to manage or lessen the effects of a psychiatric condition," including "[i]npatient care."[6] The Plan sets out several criteria for participants to receive benefits for covered services.[7] Most notably, the service must "be medically necessary," "not be excluded from coverage under [the] plan," and "meet the standards set in [Premera's] medical and payment policies."[8] These policies, according to the Plan, "are generally used to further define medical necessity" and "are based on accepted clinical practice guidelines and industry standards accepted by organizations like the American Medical Association (AMA) and the Center for Medicare and Medicaid Services (CMS)."[9] The Plan also states that the policies can be found online or by contacting customer service.[10]

To make medical necessity determinations related to residential mental health treatment, Premera uses "Utilization Management Guideline – 3.01.521 Psychiatric Evaluations in Inpatient and Residential Behavioral Health Treatment," ("Guideline 3.01.521") which relies, in part, on

[3] Def.'s MSJ 2; Pls.' MSJ 4.
[4] Def.'s MSJ 2; Pls.' MSJ 4.
[5] Def.'s MSJ 2.
[6] Administrative Record ("AR") 221, ECF No. 45, filed Apr. 16, 2026.
[7] *Id.* 210.
[8] *Id.*
[9] *Id.*
[10] *Id.*

InterQual's "Child and Adolescent Psychiatry" criteria ("InterQual Criteria").[11] Most relevant here, the InterQual Criteria require a minimum level of care for residential health treatment to qualify as medically necessary;[12] among other things, the InterQual Criteria require that a patient seeking continued stay in residential treatment receive a "[p]sychiatric evaluation at least 1 time per week" and "[i]ndividual or group or family therapy at least 3 times per week."[13]

### ***S.G.'s Treatment at Cascade Academy***

For much of her life, S.G. has struggled with trauma, emotional dysregulation, and mental health problems.[14] She has been diagnosed with obsessive-compulsive disorder, social anxiety, depression, dysmorphic dysregulation disorder, and attention-deficit/hyperactivity disorder.[15] As S.G.'s symptoms worsened, Mike G. and S.G.'s mother looked to admit S.G. to a residential treatment center.[16]

On October 6, 2021, S.G. was admitted to Cascade Academy, a licensed residential mental health treatment center in Midway, Utah.[17] On October 7, 2021, S.G. received her first psychiatric evaluation at Cascade, conducted by Clint Peterson, APRN.[18] S.G. had documented follow-up evaluations with Peterson on October 21, 2021[19] November 3, 2021[20] January 7, 2022,[21] March 2, 2022[22] and March 23, 2022.[23] And according to a note from a nurse at

[11] *See id*. 565–69.
[12] *Id.* 596.
[13] *Id.*
[14] *Id.* 1950.
[15] *Id.*
[16] *Id.* 1951.
[17] *Id.* 3473, 2170.
[18] *Id.* 3468–71.
[19] *Id.* 3428–30.
[20] *Id.* 3394–96.
[21] *Id.* 3237–39.
[22] *Id.* 3055–57.
[23] *Id.* 1839. It is unclear to the court whether Peterson met with S.G. in the creation of this report.

Cascade, S.G. had at least one other meeting with Peterson on October 14,[24] which did not result in an evaluation report produced by Peterson.[25] In addition to these evaluations with Peterson, S.G.'s treatment at Cascade included at least thirty-two individual, group, or family therapy sessions.[26]

On May 13, 2022, S.G. was discharged from Cascade.[27]

***Initial Denial of Coverage***

On October 27, 2021, while S.G. was still receiving treatment at Cascade, Plaintiffs submitted a request for authorization for residential treatment.[28] Included in the request were S.G.'s Cascade records, including her admission application, intake forms, daily staff notes, and Peterson's October 7 and October 21 psychiatric evaluations.[29]

The next day, on October 28, 2021, Premera responded to the request ("Initial Denial Letter"), denying continued coverage for S.G.'s treatment at Cascade after October 7 for a lack of medical necessity.[30] In making this determination, Premera stated that it reviewed the Plan, "[Premera's] Policy: Change Healthcare InterQual Criteria, BH: Child and Adolescent Psychiatry InterQual 2020; 3.01.521 – Psychiatric Evaluations in Inpatient and Residential Behavior Health Treatment," and S.G.'s medical records from Cascade.[31] Premera explained:

> The treatment guidelines we use state that, in addition to other requirements, continued residential for a mental health condition is medically necessary only when a psychiatric evaluation was done within one business day before admission

[24] *Id.* 3450, 3471.
[25] *See id.*
[26] *Id.* 3460, 3436, 3409, 3348, 3337, 3331, 3308, 3294, 3247, 3230, 3206, 3196, 3180, 3166, 3133, 3124, 3123, 3110, 3100, 3088, 3080, 3075, 3061, 3049, 1762, 1774, 1780, 1787, 1806, 1807, 1830, 1852.
[27] Compl. ¶ 6; Answer ¶ 6, ECF No. 15, filed Sept. 6, 2024.
[28] AR 152–80.
[29] *Id.*
[30] *Id.* 181–85.
[31] *Id.* 182. Premera did not include a copy of the relevant criteria and guidelines in its First Denial Letter. *See id.* 181–85, 2236.

> or within one business day after admission, and is then being done at least one time per week (every 7 days), by a psychiatrist, psychiatric nurse practitioner, or a psychiatric physician assistant.
>
> Continued residential treatment for a mental health condition is denied as not medically necessary after [October 7, 2021]. Information from your provider does not show that a psychiatric evaluation is being done at least one time per week (every 7 days) by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant. The information does not show any psychiatric evaluations by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant after [October 7, 2021] until [October 21, 2021], which was 14 days, not 7 days. The information shows a note by a staff person stating that a psychiatric evaluation was done by the nurse practitioner on [October 14, 2021], but the information does not include a copy of such an evaluation to show that it was actually done.
>
> The treatment guidelines we use also state that, in addition to other requirements, continued residential treatment for a mental health condition is medically necessary only when you are receiving individual or group or family therapy at least 3 times per week. The information from your provider does not show that you are receiving individual or group or family therapy at least 3 times per week. The information does not show any individual or group or family therapy sessions.[32]

In short, under the InterQual Criteria, S.G.'s treatment at Cascade was denied for lack of medical necessity because S.G.'s medical records did not reflect weekly psychiatric evaluations and at least three individual, group, or family therapy sessions a week.[33]

***Level I Appeal and Issued Explanation of Benefits***

On April 18, 2022, Plaintiffs submitted their first appeal ("Level I Appeal") of Premera's denial of coverage for S.G.'s treatment at Cascade.[34] In the Level I Appeal, Plaintiffs argued (1) that the InterQual Criteria used by Premera conflicted with the Plan, (2) that Premera's reliance on the InterQual Criteria may violate the MHPAEA, and (3) that S.G.'s treatment at Cascade was medically necessary under the Plan.[35] The appeal requested documentation and information in

[32] *Id.* 181.
[33] *Id.*
[34] *Id.* 31–43.
[35] *Id.*

Premera's response, including any documentation used in its initial determination and Level I Appeal determination.[36] The appeal also requested that Premera conduct and provide a parity analysis with supporting documentation to assess the Plan's compliance with the Parity Act.[37]

Attached to the Level 1 Appeal were twenty-seven exhibits.[38] These included S.G.'s medical records from Cascade (totaling over 600 pages) and two letters of medical necessity written by two of S.G.'s non-Cascade mental health providers, Dr. Gary P. Monkarsh, a psychologist, and Dr. Stewart S. Newman, a child and adolescent psychiatrist.[39] Both providers opined that S.G.'s symptoms and self-harm behavior justified admission to a residential treatment center.[40] Plaintiffs also requested that Premera provide a review accounting for all of their "comments, documents, records, and other information submitted by [Plaintiffs] relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."[41]

On June 29, 2022, Plaintiffs, through an authorized representative, inquired about the status of their appeal and were told that there was no appeal on file.[42] An authorized representative of Plaintiffs inquired again on July 19, 2022, and was told that the appeal was received in April.[43] The next day, on July 20, 2022, Premera sent a letter to Plaintiffs

---

[36] *Id.* 34 ("[W]e would like to request a physical copy of any and all documentation related to both the initial determination and the level one appeal determination including the reviewer's name, credentials, experience, and case notes or report."); *id.* ("Please send us physical copies of the actual criteria and guidelines used so that we may review them.").
[37] *Id.* 39–40, 42–43. The documents requested included "the plan's mental health, substance use disorder, skilled nursing facility, subacute inpatient rehabilitation, hospice or other intermediate medical/surgical or mental health and substance use disorder criteria, regardless of whether the criteria were used to evaluate this claim." *Id.* 42.
[38] *Id.* 26–28.
[39] *Id.* 27, 1942–44, 1945–47.
[40] *Id.* 1942–44, 1945–47.
[41] *Id.* 32–33 (quoting 29 C.F.R. § 2560.503-1(h)(2)(iv)).
[42] *Id.* 138.
[43] *Id.* 139.

acknowledging that it had received the Level I Appeal on April 27, 2022, and that it would "review all documentation relating to [the appeal]" and provide a determination or next steps as soon as possible.[44] On September 22, September 30, and October 7, 2022, Plaintiffs' authorized representatives continued to inquire about the status of the appeal.[45]

Apart from the acknowledgement letter, Plaintiffs received no formal response from Premera to their Level I Appeal.[46] Unbeknownst to Plaintiffs, internal Premera documents reveal that the appeal was considered "voided."[47] Instead, beginning in February 2022 and ending in June 2022, Premera sent eight Explanation of Benefit statements ("EOB" and collectively "EOBs") to Plaintiffs.[48] Each EOB concerned a month of S.G.'s treatment at Cascade.[49] For January 2022 and March 2022, the EOBs indicated that Premera had denied coverage for lack of medical necessity.[50] For April 2022, the EOB appeared to indicate that Premera approved coverage, but it showed $0 for the allowed amount without explanation.[51] For October 2022, the EOB indicated that Premera approved coverage but that Premera reduced the allowed amount for a lack of prior authorization.[52] For the rest of S.G.'s treatment, the EOBs indicated that Premera approved coverage without explanation.[53]

---

[44] *Id.* 46.
[45] *Id.* 140–41.
[46] *Id.* 12.
[47] *See id.* 748–49 (referring to Plaintiffs' second appeal as their level one appeal).
[48] *See id.* 48–63.
[49] *Id.*
[50] *Id.* 54–55 (stating in the claim notes that "[Premera's] medical staff reviewed this claim and determined that this service wasn't medically necessary"); *id.* 58–59 (same).
[51] *See id.* 60–61.
[52] *See id.* 48–49 (stating that "[p]rior authorization was not received for this service," and that "[Plaintiffs] are responsible for a share of the cost according to your plan's benefits").
[53] *See id.* 50–53, 56–57, 62–63.

***Level II Appeal***

On March 29, 2023, Plaintiffs submitted their second appeal ("Level II Appeal") to Premera.[54] The Level II Appeal noted that Plaintiffs had yet to receive any formal response to their Level I Appeal and were instead sent the eight EOBs corresponding to each month of S.G.'s treatment.[55] Concerning the EOBs, the Level II Appeal expressed confusion as to why some months were covered and some were denied as medically unnecessary; Plaintiffs maintained that "all of [S.G.'s] treatment was medically necessary."[56] Further, the Level II Appeal argued that the prior authorization penalty apparent in the October EOB was not applicable to their claim and had already been acknowledged by a Premera representative as such.[57]

The Level II Appeal also took issue with the amount paid by the health plan on the purportedly covered claims. Plaintiffs noted that the April EOB, which appeared to indicate that S.G.'s treatment was covered, showed $0 as the allowed amount.[58] As for the other covered months, the Level II Appeal argued that the apparent $240 per-diem allowed amount was too low under the Plan's calculation for out-of-network providers.[59] Reasoning that their claims were processed based on "the lowest amount the plan pays for the same or similar service from a comparable provider that has a contracting agreement with [Premera]," Plaintiffs submitted three exhibits purportedly showing what Premera or related entities had paid comparable Utah

[54] *Id.* 7–17.
[55] *Id.* 12–13.
[56] *Id.*
[57] *Id.* 13.
[58] *Id.* 14–15.
[59] *Id.*

residential treatment centers ("Comparable Provider Exhibits").[60] These Comparable Provider Exhibits reflected per-diems of $515, $567, and $800; based on the exhibits, the Level II Appeal argued that the claims should be processed at a minimum of a $515 per-diem.[61] The Level II Appeal also requested "clear and detailed documentation describing the exact methodology used to calculated [sic] the allowable charge for each of our claims."[62]

On top of the EOB issues, the Level II Appeal broadly reiterated the unanswered arguments raised in the Level I Appeal—including that S.G.'s treatment was medically necessary and that Premera was imposing treatment limitations in violation of the Parity Act—and renewed requests for documents and information.[63] In doing so, the Level II Appeal requested Premera to consider "all of the other evidence [Plaintiffs] previously submitted."[64] Attached to the Level II Appeal were 14 exhibits, including the unanswered Level I Appeal.[65]

***Level II Appeal Denial Letters and Parity Analysis***

On April 18, 2023, Premera responded to the Level II Appeal with three denial letters ("Level II Denial Letters"), each corresponding to different periods of S.G.'s stay at Cascade.[66]

The first denial letter ("First Level II Denial") corresponded to S.G.'s treatment during the months of October and November 2021.[67] It denied Plaintiffs' "request for additional reimbursement" for S.G.'s October and November 2021 treatment "because the claims processed

[60] *Id.*
[61] *Id.* 14–15, 69–88.
[62] *Id.* 15.
[63] *See id.* 14–16.
[64] *Id.* 16.
[65] *Id.* 7–8.
[66] *Id.* 408–11, 1030–34, 1527–31.
[67] *Id.* 1030.

correctly, in accordance with [Plaintiffs'] health plan."[68] Without acknowledging Plaintiffs' Comparable Provider Exhibits submitted with their Level II Appeal, the denial letter stated that the "claims were priced a per diem of $240.00, which is an amount no less than the lowest amount we pay for the same or similar service from a comparable provider that has a contracting agreement with us."[69] The denial letter acknowledged Plaintiffs' questions about the inconsistent coverage evidenced in the EOBs and stated that "prior authorization . . . was only approved for October 5, 2021, and October 6, 2021."[70] The letter continued to explain that "[t]he attached disputed claims were paid in error and should have been denied as not medically necessary," but "[a] business decision was made not to have the claims reprocessed to deny or request a refund."[71] Finally, the denial letter acknowledged that Plaintiffs requested a mental health parity analysis and that Premera would respond separately.[72]

The second denial letter ("Second Level II Denial") corresponded to S.G.'s treatment during the months of December 2021, February 2022, and May 2022.[73] This letter was largely the same as the First Level II Denial.[74] It again stated that the claims for the relevant months were processed correctly at the $240 per-diem and that allowed claims after October 6, 2021 were paid in error and should have been denied for lack of medical necessity.[75] Neither this letter nor the First Level II Denial indicated that Plaintiffs' Level I Appeal had been reviewed.[76]

---

[68] *Id.*
[69] *See id.*
[70] *Id.*
[71] *Id.*
[72] *Id.* 1030.
[73] *Id.* 1527.
[74] While the Second Level II Denial identified an external review as the next step, *id.* 1528, the First Level II Denial identified a Level II Appeal, *id.* 1031. In all other respects, besides the treatment dates, the letters are identical. *See id.* 1030–34, 1527–31.
[75] *Id.* 1527.
[76] *See id.* 1030–34, 1527–31.

The third denial letter ("Third Level II Denial") corresponded to S.G.'s treatment during the months of January, March, and April 2023.[77] This letter denied the appeal for lack of medical necessity:

> Continued Residential Treatment after October 6, 2021, is not considered medically necessary based on the clinical documentation and the plan criteria. There is no documentation of a psychiatric evaluation between October 7, 2021, and October 21, 2021. The medical policy requires that a psychiatric evaluation be performed on a weekly basis by a licensed clinical provider in order for treatment to be considered medically necessary. As there is a 14-day period without documentation of a psychiatric evaluation, the medical policy criteria is not met. Additionally, documentation of group and family therapy sessions has not been provided, which is required by the medical policy.[78]

The letter stated that the denial decision was made by a physician outside of Premera who reviewed the following:

> • Prior authorization
> • Medical records
> • Claim history
> • Call history
> • Benefits and exclusions of [the Plan]
> • Medical Policy # 3.01.521 titled; Psychiatric Evaluations in Inpatient and Residential Behavioral Health Treatment
> • InterQual criteria
> • Same specialty review report[.][79]

Enclosed with the Third Level II Denial, among other documents, was a copy of the InterQual Criteria,[80] the prior authorization file (including S.G.'s Cascade medical records from October),[81] and an independent medical review conducted by Dr. Kyle Jasper, a physician board

[77] *Id.* 408.
[78] *Id.*
[79] *Id.*
[80] *Id.* 571.
[81] *Id.* 442–70.

certified in psychiatry.[82] Nowhere else in the Third Level II Denial did it indicate that Plaintiffs' Level I Appeal had been reviewed.[83]

Dr. Jasper's review indicated that he had reviewed the appeal, the Plan, the clinical record, the initial determination letter, Premera's "Utilization Management Guideline, Psychiatric Evaluations in Inpatient and Residential Behavioral Health Treatment," and the InterQual Criteria.[84] Dr. Jasper opined that S.G.'s continued treatment at Cascade after October 6, 2021 was medically unnecessary for the same reasons provided in the Third Level II Denial.[85] He specifically referred to the InterQual Criteria, stating that it "specifies that [a] psychiatric evaluation is supposed to occur every 7 days while a patient is admitted to a residential facility," and as "these criteria has not been met, the standard of care has not been met," and "[as] the standard of care has not been met, the plan language's definition of medical necessity is not met."[86] Referencing the Plan's definition of medical necessity, Dr. Jasper concluded that S.G.'s treatment did not meet "generally accepted standards of medical practice" and was not "clinically appropriate, in terms of type, frequency, extent, site, and duration, and considered effective for the patient's illness, injury, or disease."[87]

Following the Level II Denial Letters, on April 26, 2023, Premera sent Plaintiffs a mental health parity analysis in response to Plaintiffs' requests.[88] The analysis consisted of several "Non-Quantitative Treatment Limit (NQTL) Compliance Analys[es]" and other internal

---

[82] *Id.* 412–15.
[83] *See id.* 408–11.
[84] *Id.* 412–13.
[85] *Id.* 413.
[86] *Id.*
[87] *Id.*
[88] *Id.* 682.

documents detailing Premera's processes for requiring, and standards of developing, treatment limitations for both medical/surgical benefits and mental health.[89]

***Procedural History***

In March 2024, Plaintiffs filed a complaint against Premera,[90] alleging that its denial of benefits violated both ERISA and the Parity Act.[91] On February 11, 2026, both parties moved for summary judgment,[92] which were fully briefed on May 13, 2026.[93]

**STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[94] "Where, as here, the parties in an ERISA case both moved for summary judgment, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the nonmoving party is not entitled to the usual inferences in its favor."[95]

**DISCUSSION**

The parties move for summary judgment on Plaintiffs' two claims: (1) wrongful denial of benefits under ERISA and (2) violation of the Parity Act.

**I. Denial of Benefits Claim**

---

[89] *See generally id.* 682–745.
[90] Mike G.'s employer, ExtraHop Networks Inc., was originally a party to the suit but has since been dismissed, along with another claim that is not at issue here. *See* Order Granting Stipulation of Partial Dismissal, ECF No. 24, filed Aug. 19, 2025.
[91] *See generally* Compl.
[92] Pls.' MSJ; Def.'s MSJ.
[93] Def.'s Reply in Supp. of Its Mot. for Summ. J. ("Def.'s Reply"), ECF No. 49, filed on May 13, 2026; Pls.' Reply Mem. in Supp. of Mot. for Summ. J. ("Pls.' Reply"), ECF No. 50, filed on May 13, 2026.
[94] Fed. R. Civ. P. 56.
[95] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1217 (10th Cir. 2023) (citation modified).

Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary "covered by an ERISA-governed benefit plan who believes the plan administrator wrongfully denied benefits can bring suit in . . . federal court."[96] The court reviews the denial of benefits de novo unless the plan provides the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[97]

Here, Plaintiffs and Premera agree that the de novo standard of review is applicable.[98] Under the de novo standard, the court applies the plain meaning of the Plan's language and strictly construes terms against Premera.[99] The "standard is not whether 'substantial evidence' or 'some evidence' supported [Premera's] decision; it is whether [Plaintiffs'] claim for benefits is supported by a preponderance of the evidence based on the district court's independent review."[100] That said, the court need not conduct a de novo review if the administrator's conduct fails a more lenient arbitrary and capricious standard of review.[101]

Plaintiffs make two arguments in support of their claim for benefits for S.G.'s stay at Cascade: (1) Premera's handling of their claims and appeals was arbitrary and capricious, depriving them of the meaningful dialogue required under ERISA; and (2) S.G. is entitled to benefits under the terms of the Plan.

### A. ERISA's Claim-Processing Requirements

[96] *Ellis v. Liberty Life Assurance Co. of Boston*, 958 F.3d 1271, 1278 (10th Cir. 2020).
[97] *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 115 (1989).
[98] Def.'s MSJ 15–16; Pls.' MSJ 19–20.
[99] *See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 801 (10th Cir. 2010); *see also Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1253–55 (10th Cir. 2007) (holding that the doctrine of *contra proferentem* applies to ambiguous plan language under a de novo standard of review).
[100] *Niles v. American Airlines, Inc.*, 269 F.App'x 827, 833 (10th Cir. 2008).
[101] *See David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 & n.11 (10th Cir. 2023) ("In considering whether [the administrator] abused its discretion, we ask whether its denial of benefits was arbitrary and capricious.").

An ERISA plan administrator is a fiduciary who "owes a special duty of loyalty to the plan beneficiaries."[102] As such, "ERISA requires administrators to follow specific procedures for benefit denials."[103] These procedures mandate "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[104] To facilitate this dialogue, 29 U.S.C. § 1133 lays out "minimum claims-processing requirements" in a "two-step process."[105]

The first step requires that administrators "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."[106] As a part of this first step, denial letters must, among other things, provide the specific reason and plan provisions relied on in the denial of benefits, as well as "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material is necessary."[107] Recognizing the importance of such communication, the Tenth Circuit has held that "the administrator must include its reasons for denying coverage in the four corners of the denial letter."[108]

The second step requires that administrators "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review . . . of the decision denying the claim."[109] As a part of this second step, an administrator's review procedure must,

[102] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (quoting *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 111 (2008)).
[103] *Id.*
[104] *See David P.*, 77 F.4th at 1300 (citation modified).
[105] *See id.* at 1299–300 (describing the "two-step process" required by 29 U.S.C. § 1133).
[106] 29 U.S.C. § 1133(1).
[107] *David P.*, 77 F.4th at 1299 (alteration in original) (quoting 29 C.F.R. § 2560.503-1(g)(1)(i)–(iii)).
[108] *Ian C.*, 87 F.4th at 1219; *see also D.K.*, 67 F.4th at 1239 ("ERISA denial letters play a particular role in ensuring full and fair review. ERISA regulations require that denial letters be comprehensive and include requests for additional information, steps claimants may take for further review, and specific reasons for the denial.").
[109] 29 U.S.C. § 1133(2).

among other things, "[p]rovide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits," and "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."[110] This means that reviewers "cannot shut their eyes to readily available information that may confirm the beneficiary's theory of entitlement."[111]

### B. Review of Premera's Claim Processing

Plaintiffs argue that Premera's handling of their claims and appeals was both procedurally and substantively arbitrary and capricious, depriving them of a "full and fair review" and the "meaningful dialogue" required under ERISA.[112] Before discussing these arguments, the court briefly addresses Premera's blanket opposition to them.

#### 1. Prejudice

Premera does not challenge the substance of Plaintiffs' claim-processing arguments. Apparently conceding that there may have been "procedural irregularities," Premera argues that procedural errors alone, without any showing of prejudice, do not warrant a remedy.[113] Citing *Martinez v. Plumbers & Pipefitters National Pension Plan*[114] and *Brimer v. Life Insurance Co. of North America*[115] for the proposition that a claimant must show prejudice before a court will order relief based on an ERISA procedural violation, Premera contends that Plaintiffs have not

---

[110] *David P.*, 77 F.4th at 1299 (alterations in original) (quoting 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv)).
[111] *See D.K.*, 67 F.4th at 1237 (citation modified).
[112] Pls.' MSJ 24–31.
[113] Def.'s Opp. to Pls.' Mot. for Summ. J. ("Def.'s Opp.") 6, ECF No. 39, filed on Apr. 15, 2026.
[114] 795 F.3d 1211, 1215 n.2 (10th Cir. 2015).
[115] 462 F.App'x 804, 808–10 (10th Cir. 2012).

suffered prejudice from any error in Premera's handling of their claims.[116] Premera claims, among other things, that Plaintiffs have had notice of its reason for denying their claim since October 28, 2021, when Premera sent its Initial Denial Letter, and that any additional process would not change the outcome—i.e., because S.G.'s stay at Cascade was not medically necessary.[117]

Premera's arguments here are unavailing. First, recent Tenth Circuit case law supports the proposition that an administrator's arbitrary and capricious violation of ERISA's claim-processing requirements can justify a reversal of a denial of benefits without more. In *David P. v. United Healthcare Insurance Co.*, 77 F.4th 1293 (10th Cir. 2023), the court rejected an administrator's argument that its determination should be upheld because it was supported by substantial evidence in the form of an external independent review.[118] The court upheld the district court's reversal, recognizing that the district court did not reverse "because there was insufficient evidence to support [the administrator's] decision to deny benefits, but because [the administrator] abused its discretion by inadequately processing Plaintiffs' claims."[119] The court went on to conclude that the administrator "abused its discretion by denying Plaintiffs' benefits claims *because* [the administrator] failed to comply with either the letter or the spirit of ERISA's claims-processing requirements," and it ultimately remanded to the administrator for "further, and proper, consideration."[120] Accordingly, in *David P.*, the court suggested that the failure to

[116] Def.'s Opp. 7–8.
[117] *Id.*; *see also* AR 181–85 (Initial Denial Letter).
[118] 77 F.4th at 1314.
[119] *Id.*
[120] *Id.* at 1314–15 (emphasis added).

abide by ERISA's claim-processing requirements itself can constitute a harm by depriving claimants of the "meaningful dialogue ERISA mandates."[121]

Second, even if a threshold showing of prejudice were required, Plaintiffs make one. As will be discussed in greater depth below, Plaintiffs argue that Premera's arbitrary and capricious handling of their claims led Premera to make substantive errors in its determination, such as failing to adequately consider Plaintiffs' arguments and other documents submitted with their appeals.[122] Without addressing any of the information that Plaintiffs submitted with their Level I Appeal, Premera effectively shut it eyes to arguments and information that could have changed its determination. Thus, even if a showing of prejudice were required to challenge an administrator's claim processing, Plaintiffs have done so here. The court turns now to Plaintiffs' arguments.

### 2. Arbitrary and Capricious Claim Processing

Plaintiffs claim that Premera's handling of their claims and appeals was both procedurally and substantively arbitrary and capricious. On the procedural point, Plaintiffs contend that Premera failed to abide by ERISA's claim-processing requirements by failing to do the following: identify the criteria it relied on when denying benefits, provide a description of additional material needed for Plaintiffs to perfect their claim, include copies of its guidelines and criteria with its decision, and most significantly, respond to Plaintiffs' Level I Appeal.[123] On the overlapping substantive point, Plaintiffs argue that Premera's denial rationales were

---

[121] *See id.* at 1314.
[122] *See* Pls.' MSJ 30–31.
[123] *Id.* 25–28.

sometimes factually incorrect, contradictory, and inconsistent, and most importantly, failed to engage with Plaintiffs' arguments and accompanying information included in both appeals.[124]

The court agrees that Premera abused its discretion in the processing of Plaintiffs' claims and appeals. Premera repeatedly shirked its responsibilities under the ERISA claim-processing requirements in three significant ways: (1) failing to respond or otherwise engage with Plaintiffs' Level I Appeal; (2) issuing errant EOBs that undermined meaningful dialogue; and (3) failing to adequately engage with Plaintiffs' Level II Appeal.

**a. Level I Appeal is Ignored**

Following Plaintiffs' request for prior authorization for S.G.'s continued residential treatment at Cascade,[125] Premera issued its first denial on October 28, 2021.[126] This Initial Denial Letter determined "continued inpatient coverage after October 7, 2021" was not medically necessary.[127] The letter explained:

> The treatment guidelines we use state that, in addition to other requirements, continued residential treatment for a mental health condition is medically necessary only when a psychiatric evaluation was done within one business day before admission or within one business day after admission, and is then being done at least one time per week (every 7 days), by a psychiatrist, psychiatric nurse practitioner, or a psychiatric physician assistant.[128]

The letter then applied this treatment guideline to the medical records received from Cascade:

> Continued residential treatment for a mental health condition is denied as not medically necessary after [October 7, 2021]. Information from your provider does not show that a psychiatric evaluation is being done at least one time per week (every 7 days) by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant. The information does not show any psychiatric evaluations by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant after

[124] *See id.* 28–31.
[125] AR 152–80.
[126] *Id.* 181–85.
[127] *Id.* 181.
[128] *Id.*

> [October 7, 2021] until [October 21, 2021], which was 14 days, not 7 days. The information shows a note by a staff person stating that a psychiatric evaluation was done by the nurse practitioner on [October 14, 2021], but the information does not include a copy of such an evaluation to show that it was actually done.[129]

The letter also stated that Premera's "treatment guidelines" for the medical necessity of continued residential mental health treatment require "individual or group or family therapy at least 3 times a week."[130] Applying the guidelines to the medical records from Cascade, the letter explained that "[t]he information from your provider does not show that you are receiving individual or group or family therapy at least 3 times per week. The information does not show any individual or group or family therapy sessions."[131]

While the Initial Denial Letter did not cite any specific provisions and applicable guidelines in the Plan, it did under a separate heading provide that the Plan, Guideline 3.01.521, InterQual Criteria, and medical records provided by Cascade were reviewed. It also informed Plaintiffs of how they could acquire "a free copy of the criteria . . . used to make the decision."[132] Further, the letter plainly explained that coverage was being denied because weekly psychiatric evaluations—as well as at least three weekly individual, group, or family therapy sessions—were required for the treatment to be medically necessary and there was insufficient documentation from Cascade to show that such treatment was being provided.[133] Thus, the Initial Denial Letter mostly did what it was supposed to: "set[] forth the specific reasons for such denial, written in a

---

[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] *See id.* 182; *see also* 29 C.F.R. § 2560.503-1(g)(1)(v)(A) ("If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.").
[133] *See* AR 181.

manner calculated to be understood by the participant."[134] But Premera's engagement in a "meaningful dialogue" with Plaintiffs largely ended here.

On April 18, 2022, Plaintiffs submitted their Level I Appeal.[135] Included with the appeal were twenty-seven exhibits, including over 600 pages of medical records from Cascade and two letters of medical necessity written by two of S.G.'s non-Cascade mental health providers.[136] The court's review of the medical records indicates that S.G. had at least five documented follow-up evaluations with her provider at Cascade following the initial psychiatric evaluation on October 7, 2021.[137] And there were also at least thirty-two documented individual, group, or family therapy sessions[138]—and eleven more counting the sessions that S.G. did not attend.[139] The two medical necessity letters, written separately by Dr. Gary P. Monkarsh and Dr. Stewart S. Newman, together opined that S.G.'s symptoms and self-harm behavior justified her admission to a residential treatment center.[140]

In addition to the exhibits, Plaintiffs raised several thorough arguments in their Level I Appeal that, if credited by Premera, could have warranted coverage of S.G.'s treatment at Cascade.[141]

First, Plaintiffs argued that Premera's reliance on the InterQual Criteria and Policy 3.01.521 conflicted with the terms of the Plan.[142] They claimed it did so by imposing

---

[134] *See* 29 U.S.C. § 1133(1).
[135] AR 31.
[136] *Id.* 26–27.
[137] *See* id. 3428–30 (October 21, 2021); *id.* 3394–96 (November 3, 2021); *id.* 3237–39 (January 7, 2022); *id.* 3055–57 (March 2, 2022); *id.* 1839 (March 23, 2022).
[138] *Id.* 3460, 3436, 3409, 3348, 3337, 3331, 3308, 3294, 3247, 3230, 3206, 3196, 3180, 3166, 3133, 3124, 3123, 3110, 3100, 3088, 3080, 3075, 3061, 3049, 1762, 1774, 1780, 1787, 1806, 1807, 1830, 1852.
[139] *See id.* 3260, 3189, 3154, 3111, 3082, 3074, 1812, 1877, 1882, 1897, 1900.
[140] *Id.* 1942–44, 1945–47.
[141] *See id.* 32–42.
[142] *Id.* 34–36.

requirements in conflict with Utah law—which the Plan stated would control in such instances[143]—and by ignoring language in the InterQual Criteria and Policy 3.01.521 that limited policies' respective scopes.[144] Accordingly, Plaintiffs argued that the InterQual Criteria and Policy 3.01.521 were not "intended to be the ultimate decision makers."[145] And given that Cascade is licensed under Utah law and accredited by the Joint Commission, Plaintiffs concluded that S.G. was receiving care at Cascade that satisfied the Plan's "requirements for reimbursable mental health care benefits."[146]

Second, Plaintiffs argued that Premera's reliance on the InterQual Criteria and Policy 3.01.521 may have violated the Parity Act.[147] Citing the Parity Act requirements and the Plan's guidelines for skilled nursing facilities, Plaintiffs argued that the requirements imposed by the InterQual Criteria appeared to be "far more restrictive such as" by requiring "weekly psychiatric visits."[148]

And third, Plaintiffs contended that S.G.'s treatment was medically necessary as defined by the Plan.[149] Plaintiffs quoted the Plan's requirements for medical necessity and claimed that treatment provided at Cascade met those requirements.[150] In doing so, Plaintiffs also pointed

---

[143] Plaintiffs pointed to this "Conformity With The Law" provision in the Plan: "If any provision of the Group Contract or any amendment thereto is deemed to be in conflict with applicable state or federal laws or regulations, upon discovery of such conflict the Group Contract will be administered in conformance with the requirements of such laws and regulations as of their effective date." *Id.* 35 (quoting *id.* 263). And they claimed that weekly psychiatric evaluations were not required under Utah law. *Id.* Plaintiffs also noted that Cascade is accredited by the Joint Commission, which does not require weekly psychiatric evaluations. *Id.*

[144] Plaintiffs noted that the InterQual Criteria provided that it could not alone "provide the sole basis for definitive decisions," *id.*, and that Policy 3.01.521 provided that it "is subject to the limits and conditions of the member benefit plan," *id.* 35–36.

[145] *Id.* 36.

[146] *Id.*

[147] *See id.* 36–40.

[148] *Id.* 39.

[149] *Id.* 40–42.

[150] *Id.* 40–41.

Premera to some of their attached exhibits—including the Cascade medical records and the two letters of medical necessity—to show S.G.'s need for the treatment offered by Cascade.[151]

Whether any of Plaintiffs' arguments or information submitted in their Level I Appeal were unpersuasive to Premera the court cannot say, because there is no evidence that Premera reviewed the appeal at all. Following the submission of the Level I Appeal on April 18, 2022, Plaintiffs were met with silence concerning its status for months. Plaintiffs reached out to Premera about the appeal twice—once on June 29, 2022, when they were told that there was no appeal on file, and again on July 19, 2022, when they were told that the appeal was received in April.[152] On July 20, 2022, three months after the submission, Premera finally acknowledged that it received the appeal in April and represented that it would "review all documentation related to [the appeal]" and provide a determination or next steps as soon as possible.[153] This is despite the Plan providing that a level one appeal would be responded to within fourteen to thirty days and Plaintiffs referencing such in their Level I Appeal.[154] Still receiving no response, Plaintiffs reached out again on September 22, September 30, and October 7, 2022, but to no avail.[155]

Instead, the only other correspondence Plaintiffs received from Premera before they submitted their Level II Appeal were a series of EOBs.[156] While the court will address the substance of these EOBs in more detail below, none of them acknowledged the appeal.[157] Thus,

[151] *Id.* 41–42.
[152] *See id.* 138, 139.
[153] *Id.* 46.
[154] *Id.* 261.
[155] *Id.* 140–41.
[156] Four of the EOBs were sent after the Level I Appeal was submitted with the latest being sent on June 25, 2022. *Id.* 48–63.
[157] *Id.*

by the time Plaintiffs submitted their Level II Appeal on March 29, 2023,[158] their Level I Appeal had gone completely unanswered for almost a year.

Still, Premera had another chance to review the arguments and information again as Plaintiffs specifically requested them to do so in their Level II Appeal.[159] But Premera did not do so. Nowhere in the three Level II Denial Letters did Premera indicate that it had reviewed any of the Level I Appeal, including Plaintiffs' arguments concerning the plan language, S.G.'s medical records, and the two letters of medical necessity.[160] Indeed, the Third Level II Denial—the only one concerning the medical necessity of S.G.'s treatment—appears to review only the same information that was included during the *initial* review process. While the Third Level II Denial claims that it reviewed "[m]edical records" and "[c]laim history,"[161] it restates the same conclusion, information, and rationale given in the Initial Denial Letter:

> There is no documentation of a psychiatric evaluation between October 7, 2021, and October 21, 2021. The medical policy requires that a psychiatric evaluation be performed on a weekly basis by a licensed clinical provider in order for treatment to be considered medically necessary. As there is a 14-day period without documentation of a psychiatric evaluation, the medical policy criteria is not met. Additionally, documentation of group and family therapy sessions has not been provided. which is required by the medical policy.[162]

---

[158] *Id.* 12.
[159] In the appeal, Plaintiffs notified Premera that "we have yet to receive a formal response to our appeal," and requested that Premera review "all of the other evidence we have previously submitted" in addition to the new arguments and information. *Id.* 12, 16.
[160] *See id.* 1030–34, 1527–31, 408–11.
[161] *Id.* 408.
[162] *Id.*; *see also id.* 181 ("Continued residential treatment for a mental health condition is denied as not medically necessary after 10/7/21. Information from your provider does not show that a psychiatric evaluation is being done at least one time per week . . . . The information does not show any psychiatric evaluations . . . after 10/7/21 until 10/21/21, which was 14 days, not 7 days. . . . The information from your provider does not show that you are receiving individual or group or family therapy at least 3 times per week. The information does not show any individual or group or family therapy sessions.").

The same is true of the independent medical review accompanying the Third Level II Denial, as the denial letter repeats the conclusion from the independent medical review almost verbatim.[163] Thus, there is simply no sign in the Level II Denial Letters, even inferentially, that Premera reviewed *any* of Plaintiffs' Level I Appeal.

In sum, Premera never substantively responded to the Level I Appeal and its supporting documentation.[164] This is the antithesis of the "full and fair review" that ERISA requires.[165] "This review must include a 'meaningful dialogue' between the claimant and the administrator, which requires 'an ongoing, good faith exchange of information' to ensure that the terms of the plan are applied accurately and the benefits are dispensed fairly."[166] A good faith exchange of information "presumes that the administrator will consider any relevant evidence in the shared record between the parties that supports the claimant's receiving benefits."[167] Accordingly, Premera was required to "[p]rovide for a review that takes into account all . . . information submitted by [Plaintiffs] relating to the claim."[168]

Because Premera essentially ignored Plaintiffs' Level I Appeal, it never addressed: (1) S.G.'s medical records from Cascade, which included evidence of several psychiatric evaluations and numerous therapy sessions; (2) two letters of medical necessity, which supported S.G.'s need for residential treatment; and (3) Plaintiffs' arguments against the Initial Denial Letter, which

---

[163] *See id.* 413 ("There is no documentation of a psychiatric evaluation between DOS 10/7/2021 and 10/21/2021. The medical policy specifies that a psychiatric evaluation is supposed to be conducted once weekly. As there is a 14-day period with documentation of a psychiatric evaluation, the medical policy criteria is not met. Additionally, documentation of group and family therapy sessions has not been provided either, which is required by the medical policy.").
[164] In fact, unbeknownst to Plaintiffs and for reasons that are not apparent from the administrative record, internal Premera documents show that the appeal was considered "voided." *See id.* 748–49.
[165] *See* 29 U.S.C. § 1133(2).
[166] *Ian C.*, 87 F.4th at 1223 (quoting *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003)).
[167] *Id.*
[168] *See* 29 C.F.R. § 2560.503-1(h)(2)(iv).

could have established that S.G.'s treatment as Cascade satisfied the Plan's requirements for coverage if credited by Premera. While Premera was not required to accede to any of this information or arguments, Premera was required to engage with it and communicate with Plaintiffs why it did not change its determination.[169] In other words, Premera's reviewers were not allowed to "shut their eyes to readily available information that may confirm the beneficiary's theory of entitlement."[170]

In its briefing, Premera provides some response to the information Plaintiffs raised in their Level I Appeal.[171] But such post-hoc explanations ignore the problem here. "Whatever the merits of these explanations, the problem is that none of them were offered in the denial letters or medical review[]."[172] Indeed, "[i]t cannot be that the depth of an administrator's engagement with" evidence submitted by a claimant "would be revealed only when the record is presented for litigation."[173] If Premera believed that the information and arguments submitted by Plaintiffs in their Level I Appeal were insufficient to change its denial rationale, "it could have said so and explained why."[174] But, instead, Premera ignored them, "denying Plaintiffs the meaningful dialogue ERISA mandates."[175]

---

[169] *See D.K.*, 77 F.4th at 1241 ("[An administrator's] duties under ERISA require them to address medical opinions, particularly those which may contradict their findings. This is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to the opinions.").
[170] *Id.* at 1237 (citation modified).
[171] *See* Def.'s MSJ 18–20; Def.'s Reply 4 –7.
[172] *Robert B. v. Premera Blue Cross*, 701 F. Supp. 1153, 1178 (D. Utah 2023).
[173] *See D.K.*, 67 F.4th at 1241.
[174] *David P.*, 77 F.4th at 1315.
[175] *See id.*

By failing to acknowledge, much less respond to Plaintiffs' Level I Appeal, Premera "failed to comply with either the letter or the spirit of ERISA's claims-processing requirements" and thereby abused its discretion.[176]

**b. EOBs Further Undermine Meaningful Dialogue**

As explained above, the only correspondence Plaintiffs received from Premera between submitting their Level I Appeal and Level II Appeal were a series of EOBs.[177] These eight EOBs—each corresponding to a different period of S.G.'s treatment at Cascade—purported to approve coverage for October, November, and December 2021, and February, April, and May 2022, and deny coverage for January and March 2022.[178] For the denied months, the EOBs stated that coverage was denied because "[o]ur medical staff . . . determined that this service wasn't medically necessary," without any further explanation.[179] Adding to the confusion, October's EOB reduced the allowed amount for a lack of prior authorization despite later denial letters showing that prior authorization was approved,[180] and April's EOB showed a $0 allowed amount despite indicating that the treatment was covered.[181]

These EOBs, in conjunction with the Initial Denial Letter and lack of response to the Level I Appeal, resulted in confusion and ambiguity concerning the status of Plaintiffs' claim for benefits. Significantly, the EOBs resulted in inconsistent denial rationales and coverages being communicated to Plaintiffs—that is, the Initial Denial Letter denied coverage after October 7,

---

[176] *See id.* 1314–15.
[177] *See* AR 48–63.
[178] *Id.* 48–63.
[179] *Id.* 55, 59.
[180] *Id.* 49; *see id.* 408 ("Our records show the prior authorization . . . was only approved for October 5, 2021, and October 6, 2021.").
[181] *Id.* 60–61.

2021, while the EOBs purported to approve coverage for six of the eight months of S.G.'s treatment, including October.[182] And although the later post-Level II appeal denial letters clarified that Plaintiffs' claims purportedly "were paid in error and should have been denied as not medically necessary,"[183] Plaintiffs were still left in the dark for nearly a year by the confusion caused by the EOBs.[184] In fact, a significant portion of Plaintiffs' Level II Appeal was focused on the new issues generated by the EOBs despite most of them being allegedly issued in error.[185] Thus, where "[t]he purpose of ERISA's claims-processing requirements is to provide benefits claimants with meaningful dialogue with the administrator,"[186] these errant EOBs further precluded a meaningful dialogue—even with the later clarification. Here too, then, Premera's conduct was arbitrary and capricious.[187]

**c. Portions of Level II Appeal are Ignored**

After receiving no response to their Level I Appeal for nearly a year, Plaintiffs submitted their Level II Appeal.[188] This appeal, among other things, notified Premera that Plaintiffs' Level I Appeal had gone unanswered, requested review of that appeal, and raised several new arguments concerning the received EOBs.[189] While Premera answered the Level II Appeal, its responses still evinced a lack of engagement with the appeal's substance in two ways.

---

[182] *Compare id.* 181 (denying "continued inpatient coverage after October 7, 2021"), *with id.* 48–63 (appearing to allow coverage for October 2021, November 2021, December 2021, February 2022, April 2022, and May 2022).
[183] *See, e.g.*, *id.* 1527.
[184] The last EOB was sent on June 25, 2022, *id.* 63, and the Level II Denial Letters were sent on April 18, 2023, *id.* 1030, 1527, 408.
[185] *See id.* 12–15 (discussing the inconsistent allowed amounts for purportedly covered months).
[186] *See David P.*, 77 F.4th at 1315.
[187] *See id.* 1314–15 (concluding that the administrator abused its discretion "by denying Plaintiffs the meaningful dialogue ERISA mandates").
[188] AR 12, 31.
[189] *See id.* 12–17.

First and foremost, as previously explained, the Level II Appeal provided Premera one more opportunity to review Plaintiffs' Level I Appeal. Plaintiffs included a copy of their Level I Appeal as an exhibit, notified Premera they had "yet to receive any formal response to [their] appeal," and requested that, in addition to the new information and arguments raised in the Level II Appeal, Premera review "all of the other evidence we have previously submitted."[190] But Premera did not do so.[191] Accordingly, it effectively "shut its eyes" to information supportive of Plaintiffs' claim for benefits *twice*, depriving Plaintiffs of a "full and fair review" of the initial denial.[192]

Second, Premera failed to adequately address Plaintiffs' arguments stemming from the errant EOBs. These arguments focused primarily on the amounts paid by the health plan on the purportedly covered claims. Plaintiffs took issue with two months in particular—October and April—that appeared to be approved yet showed a difference in the amount paid from the other approved months. For October, Plaintiffs noted that they indicated that there was a penalty for a lack of prior authorization—which, as Plaintiffs argued, Premera had confirmed was not applicable to their claim.[193] And for April, Plaintiffs noted that the EOB indicated that the month was covered, yet it showed $0 as the amount allowed.[194]

More generally, Plaintiffs took issue with how the approved claims appeared to be processed. Plaintiffs noted that the EOBs for the other covered months showed an allowed amount of $240 per-diem; they argued that this amount was too low under the Plan's terms.[195]

---

[190] *Id.* 12, 16.
[191] *See id.* 1030–34, 1527–31, 408–11.
[192] 29 U.S.C. § 1133(2); *see also D.K.*, 67 F.4th at 1237.
[193] *See* AR 13 (noting that a Premera representative "confirmed that this issue was not applicable to our case").
[194] *See id.* 14.
[195] *Id.* 13–15.

Citing the Plan's calculation for out-of-network providers—which Plaintiffs determined must be "the lowest amount the plan pays for the same or similar service from a comparable provider that has a contracting agreement with us"—Plaintiffs provided three examples of higher per-diems being paid to providers who they believed met this provision.[196] These Comparable Provider Exhibits reflected per-diems paid at $515, $587, and even $800.[197] Accordingly, Plaintiffs argued their claims should have been processed at a minimum $515 per-diem.[198]

In response to these arguments, Premera offered only cursory explanations and conclusions. In its Level II Denial Letters relating to the months where coverage was mistakenly approved, Premera stated that "prior authorization . . . was only approved for October 5, 2021, and October 6, 2021" and that "the disputed claims were paid in error and should have been denied as not medically necessary."[199] In these letters, Premera also summarily stated, without any support or reference to the Comparable Provider Exhibits, that the "claims were priced at a per diem of $240.00, which is an amount no less than the lowest amount we pay for the same or similar service form a comparable provider that has a contracting agreement with us."[200] Not only did these letters fail to grapple with Plaintiffs' arguments and submitted information, but they also tended to support Plaintiffs' claim that October's prior authorization penalty was in error without rectifying that mistake.[201]

---

[196] *See id.* 14–15.
[197] *Id.* 15.
[198] *Id.*
[199] *See id.* 1030, 1527.
[200] *Id.*
[201] *Id.* ("Our records show the prior authorization . . . was only *approved* for October 5, 2021, and October 6, 2021." (emphasis added)).

As was the case with the Level I Appeal, Premera was required to "take[] into account all comments, documents, and other information submitted by the claimant relating to the claim" as a part of the full and fair review process mandated by ERISA.[202] Its failure to offer any more than conclusory statements in response to the information provided in the Level II Appeal, while failing to even acknowledge that information, was arbitrary and capricious and deprived Plaintiffs of a full and fair review.[203]

**C. Remedy**

Having concluded that Premera acted arbitrary and capriciously in its handling of Plaintiffs' claims and appeals, the court turns to the question of remedy. The court can either remand back to the administrator for further, proper consideration or order an award of benefits.[204] The decision "hinges on the nature of the flaws in the administrator's decision."[205] Generally, remand is appropriate when "the administrator's flawed handling could be cured by a renewed evaluation to address, for example, a failure to make adequate findings or to explain adequately the grounds for a decision."[206] And an award of benefits is proper "when the record shows that benefits should clearly have been awarded by the administrator."[207]

But, as the Tenth Circuit observed in *D.K. v. United Behavioral Health*, "[t]hat is not the only instance in which a court may award benefits. If a plan administrator's actions were clearly arbitrary and capricious, then remand is unnecessary, and a reviewing court may award

[202] *See D.K.*, 67 F.4th at 1242 (quoting 29 C.F.R. § 2560.503-1(h)(2)(iv)).
[203] *See id.* (holding that an administrator's conclusory responses when provided "with extensive information" by the claimant "did not constitute a full and fair review"); *see also David P.*, 77 F.4th at 1311.
[204] *David P.*, 77 F.4th at 1315.
[205] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1229 (10th Cir. 2021) (quoting *Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008)).
[206] *D.K.*, 67 F.4th at 1243 (citation modified).
[207] *Id.*; *see also David P.*, 77 F.4th at 1315.

benefits."[208] Indeed, remand is improper "if it serves primarily to give the defendants an opportunity to retool a defective appeals system"[209] or gives an administrator acting unjustly another "bite at the apple."[210]

While the court cannot say that Plaintiffs have demonstrated that S.G. is clearly entitled to benefits, an award of benefits is proper here given Premera's significant, repeated violations of ERISA's claim-processing requirements. The purpose of these requirements "is to provide benefits claimants with meaningful dialogue with the administrator in order to prevent frivolous litigation, among other things."[211] And while Plaintiffs attempted to engage in this meaningful dialogue—providing Premera with two reasoned and thorough appeals of the adverse benefit determination—Premera failed to do its part.

Most egregiously, Premera failed to engage with Plaintiffs' Level I Appeal at all, despite having over a year to do so and being reminded and afforded another opportunity to do so by Plaintiffs.[212] By failing to respond, Premera flatly ignored most of S.G.'s medical records from Cascade, two letters of medical necessity from two of S.G.'s medical providers, and several detailed arguments based on the Plan's terms that S.G. was entitled to benefits.[213] Further, in the midst of its failure to respond, Premera added to the confusion by issuing a series of EOBs that allegedly mistakenly approved coverage for several months of S.G's treatment while denying others as medically unnecessary.[214] And when Plaintiffs again attempted to engage in dialogue

[208] 67 F.4th at 1243 (citing *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175-76 (10th Cir. 2006)).
[209] *See id.* (citation modified) (quoting *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 648 (2d Cir. 2002)).
[210] *See id.* (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001)).
[211] *David P.*, 77 F.4th at 1315.
[212] AR 12, 16.
[213] *See generally id.* 26–43.
[214] *See id.* 48–63.

with Premera in their Level II Appeal, Premera again failed to meaningfully participate. Its response, comprised of three denial letters, offered nothing more than conclusory statements without analysis or reference to Plaintiffs' submitted information and arguments.[215]

Given the repeated opportunities that Premera failed to take to engage in a meaningful dialogue with Plaintiffs, the court sees no reason to offer Premera another "bite at the apple."[216] The court does not take this remedy lightly and does not believe it to be warranted in every case with procedural mishaps. But, here, in light of the "clear and repeated" violations of ERISA's claim-processing requirements, remand would only serve to give Premera "an opportunity to retool a defective appeals system."[217]

The court therefore awards benefits to Plaintiffs for S.G.'s treatment at Cascade and orders a limited remand to Premera to determine the correct benefit amount under the Plan's terms. During remand, Premera shall properly engage with the Comparable Provider Exhibits Plaintiffs submitted with their Level II Appeal. Because the court awards benefits, the parties agree that Plaintiffs' Parity Act claim is moot.[218]

**ORDER**

[215] *See id.* 1030–34, 1527–31, 408–11.
[216] *See D.K.*, 67 F.4th at 1243–44 ("the administrator's clear and repeated procedural errors in denying this claim, it would be contrary to ERISA fiduciary principles to mandate a remand and provide an additional 'bite at the apple.'"); *See also E.O. v. Premera Blue Cross*, No. 2:23-CV-00443, 2026 WL 1875695, at *15–16 (D. Utah June 30, 2026) (awarding benefits for "serious procedural violations" without finding an entitlement to benefits); *D.B. v. United UnitedHealthcare Ins. Co.*, No. 1:21-CV-00098, 2026 WL 851250, at *11 (D. Utah Mar. 27, 2026) (awarding benefits for procedural errors despite being "unable to definitively find that the . . . treatment was medically necessary").
[217] *See id.* at 1243 (citation modified).
[218] *See* Pls.' MSJ 35 n.169; Def.'s MSJ 33–35.

Accordingly, ' Motion for Summary Judgment is GRANTED IN PART.[219] Premera's Motion for Summary Judgment is DENIED.[220] The court AWARDS benefits to Plaintiffs for S.G.'s treatment at Cascade and REMANDS to Premera to determine the correct benefit amount under the Plan consistent with this Memorandum Decision and Order. The court does not address the parties' cross-motions for summary judgment on the Parity Act claim because this order has rendered the issue moot.

Signed September 28, 2026.

BY THE COURT

David Barlow
United States District Judge

[219] ECF No. 28.
[220] ECF No. 27.